**LEHIGH COAL AND NAVIGATION COMPANY, Plaintiff,**

v.

**GEKO–MAYO, GMBH et al., Defendants**

v.

**Technische Werke Kaiserslautern, A.G. Third-party Defendants.**

**No. CIV. A. 98–751.**

United States District Court, E.D. Pennsylvania.

July 8, 1999.

---

W. Atlee Davis, III, Curran Law Offices, Pottsville, PA, for Lehigh Coal and Navigation Co., Plaintiff.

David M. Backenstoe, Bethlehem, PA, for Geko—Mayo, GmbH, Defendant.

Kenneth H. Zucker, Michael S. Hino, Pepper, Hamilton & Scheetz, Berwyn, PA, Reed L. Von Maur, I. Faison Hicks, Parker Poe Adams Bernstein, Gho Vol Ger St., Salzbach, Germany, for Technische Werke Kaiserslautern, A.G., Defendant.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

## I. INTRODUCTION

This is a contract case which requires the court, as a threshold matter, to determine whether a federal court sitting in Pennsylvania, may exercise personal jurisdiction over a German corporation who is a party to a contract with another German corporation for work to be performed in Germany. Third-party defendant, Technische Werke Kaiserslautern, A.G. ("TWK"), a corporation formed under the laws of the German Federal Republic and with its principal place of business located in Kaiserslautern, Germany, has moved to dismiss the third-party complaint filed by defendant, Geko—Mayo, GmbH ("Geko—Mayo"), another German corporation with its principal place of business in Germany. Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2), TWK moves to dismiss Geko—Mayo's third-party complaint on the basis of this court's lack of subject matter and personal jurisdiction over TWK. In addition, TWK moves to dismiss this action based on improper venue, pursuant to Federal Rule of Civil Procedure 12(b)(3). For the reasons set forth below, this court will grant TWK's motion to dismiss based on a lack of both specific and general personal jurisdiction. Accordingly, this court will not address the issues of subject matter jurisdiction, see *Ruhrgas AG v. Marathon Oil Co.*, —— U.S. ——, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) (rejecting the contention that a federal district court is barred in all circumstances, from dismissing case because of a lack of personal jurisdiction without first deciding the issue of subject matter jurisdiction), or improper venue.

## II. BACKGROUND

The following facts are uncontested. On June 26, 1995, Geko—Mayo and TWK entered into a contract which required Geko—Mayo to operate TWK's Kaiserslautern heating facility plant and deliver steam to TWK's customers. *See* Ex. 2 of Geko—Mayo's Third—Party Complaint (hereinafter "Contract to Supply Steam").[1] The contract also provided for the delivery of the coal that was to be burned in TWK's heating facility. The contract specifically required Geko—Mayo to use "anthracite coal of American origin" in generating the steam in the facility. This clause in the contract was included to fulfill TWK's obligations under a contract with the United States Air Force in Europe. *Id.* ¶¶ 15.1–15.3.[2] In an effort to obtain the coal required by TWK, Geko—Mayo and ESP—Geko, GmbH ("ESP")[3], Geko—Mayo's sub-

---

1. The contract was written in the German language and signed by the parties in Kaiserslautern, Germany.

2. On May 5, 1995, TWK entered into a sole source heating contract with the United States Air Force ("Air Force contract"). The contract provided, *inter alia,* that: 1) TWK would provide district heat to the U.S. military installation in Kaiserslautern; 2) the United States would pay TWK to construct the heating facility; and 3) TWK must use United States anthracite coal as a baseload heating source to produce steam in order to heat the U.S. military installation.

3. ESP is another corporation organized under the laws of the German Federal Republic, with its principal place of business in Muenchen Germany. According to Geko—Mayo,

contractor, allegedly entered into contracts with Lehigh Coal and Navigation Company ("Lehigh") to provide the required coal.

On February 17, 1998, Lehigh filed a complaint in this court against Geko–Mayo and ESP alleging, *inter alia,* that Geko–Mayo and ESP failed to pay on invoices for the coal Lehigh delivered to Geko–Mayo and ESP. Pursuant to these contracts Lehigh had supplied and delivered to Geko–Mayo and ESP, anthracite coal in an amount in excess of $310,000. Neither Geko–Mayo nor ESP has paid for any of the coal delivered by Lehigh.

Prior to answering Lehigh's complaint, however, on March 3, 1998, Geko–Mayo filed a third-party complaint against TWK, as a third-party defendant, claiming that because TWK has allegedly failed to pay Geko–Mayo for the coal delivered by Lehigh and used to generate steam in TWK's facility in Kaiserslautern, Geko–Mayo has been unable to pay the monies it owes to Lehigh. *See* Geko–Mayo's Third–Party Compl. ¶¶ 12–13, 15 and 18. Geko–Mayo further alleges in its third-party complaint, that TWK breached the Contract to Supply Steam by failing to pay Geko–Mayo for the delivery of the coal and steam.

TWK filed the instant motion to dismiss, arguing that this court lacks both specific and general personal jurisdiction. TWK asserts that the court lacks specific personal jurisdiction over TWK because it undertook no acts in and maintained no contacts with Pennsylvania, and thus Geko–Mayo's cause of action does not arise out of any contacts that TWK had with the forum state. In addition, since TWK has maintained no contact with the forum state, TWK argues that the court lacks general jurisdiction because Geko–Mayo cannot show that TWK maintained continuous and systematic contacts with the forum state.[4]

Geko–Mayo counters that this court has both specific and general personal jurisdiction because TWK has a history of dealing with United States coal companies, specifically companies located in Pennsylvania. Geko–Mayo maintains that: 1) TWK's efforts to lobby Pennsylvania Congressional representatives and representatives of Pennsylvania coal companies in order to influence the United States to enter into a contract with TWK; and 2) the actual contract signed between the parties which required TWK to procure U.S. anthracite coal are sufficient for this court to establish both specific and general personal jurisdiction over TWK in this third-party action.[5]

ESP "act[ed] as a subcontractor for [Geko–Mayo] and, in such capacity and with such authority, to secure anthracite coal and other fuel for and to assist [Geko–Mayo] in the operation and maintenance of a private power heating facility in the City of Kaiserslautern, German Federal Republic." Geko–Mayo's Third–Party Compl. ¶ 10. ESP has not entered an appearance in this litigation, and has not otherwise responded to the underlying complaint.

4. TWK also contends that the court lacks subject matter jurisdiction over the third-party dispute because there is a lack of complete diversity between Geko–Mayo and TWK. Nor is there a federal question presented in the third-party complaint. Furthermore, TWK asserts that the dispute between TWK and Geko–Mayo is neither ancillary nor pendent to the original claims brought by Lehigh.

Lastly, TWK argues that venue for the third-party complaint against TWK is improper in this district, and the action should be dismissed on that basis and under the principles of *forum non conveniens.* In support, TWK points to the following: a forum selection clause in the Contract to Supply Steam which provides that the German courts would have jurisdiction; the courts of Kaiserslautern, Germany can provide the relief sought by Geko–Mayo; and the pursuit of the claim in this court would pose an undue burden on the parties and the court due to the remote location of witnesses and in light of the requirement that this court may need to apply German law to Geko–Mayo's claims against TWK.

5. In addition, Geko–Mayo argues that this court has subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 14 because TWK may be liable to Geko–Mayo for all or part of Lehigh's claim against Geko–Mayo. Finally, Geko–Mayo asserts that venue is proper in this district because the contract's

## III. LEGAL STANDARD

 Under the Federal Rules of Civil Procedure, personal jurisdiction over a non-resident defendant may be exercised to the extent permitted under state law. Fed.R.Civ.P. 4(e). Pennsylvania authorizes the exercise of long-arm jurisdiction to the extent permitted under the Due Process Clause.[6] Thus, in order to determine whether the court may properly exercise personal jurisdiction over a defendant, the court must undertake two separate and distinct inquiries: (1) is personal jurisdiction properly exercised under the forum's long-arm statute? and (2) does the exercise of personal jurisdiction over the defendant comport with due process under the United States Constitu-

forum selection clause is not valid, and under the principles of *forum non conveniens*, it would be of no greater convenience for both Geko–Mayo and TWK to litigate this dispute in Germany rather than Pennsylvania.

6. Section 5322(b) of the Pennsylvania long-arm statute provides that personal jurisdiction "shall extend to all persons ... to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons.Stat. Ann. § 5322(b) (West 1998).

7. There is a split of authority as to how this inquiry is to be conducted. Pennsylvania courts and some federal courts have examined whether the contacts of the defendant are of the type enumerated in the Pennsylvania long-arm statute before undertaking the analysis under the Due Process Clause. *See, e.g., Kubik v. Letteri,* 532 Pa. 10, 614 A.2d 1110 (Pa.1992); *Leonard A. Feinberg, Inc. v. Central Asia Capital Corp.,* 936 F.Supp. 250, 254 (E.D.Pa.1996); *Mann v. Tom James Co.,* 802 F.Supp. 1293 (E.D.Pa.1992). By contrast, some federal courts, in practice, collapse the two-step inquiry into one, and proceed directly to the second prong, relying on the language of the Pennsylvania long-arm statute which permits the exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment. *See, e.g., Barrett v. Catacombs,* 44 F.Supp.2d 717, 722–24 (E.D.Pa.1999) *(citing Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992); *Empire Abrasive Equipment v. H.H. Watson, Inc.,* 567 F.2d

tion? *See IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 258–59 (3d Cir.1998). Whether the exercise of long-arm statute jurisdiction is proper is a matter of state law. *See Mann v. Tom James Co.,* 802 F.Supp. 1293, 1295 (E.D.Pa.1992) *(citing Kubik v. Letteri,* 532 Pa. 10, 614 A.2d 1110, 1112 (Pa.1992)). On the other hand, whether the exercise of jurisdiction comports with due process is a matter of federal law. *Id.* *(citing Nolt & Nolt, Inc. v. Rio Grande, Inc.,* 738 F.Supp. 163, 165 (E.D.Pa.1990)) *(citing Empire Abrasive Equipment Corp. v. H.H. Watson, Inc.,* 567 F.2d 554, 556 n. 1 (3d Cir.1977)).[7]

 In order to address the first inquiry, the court turns to Pennsylvania law,

554, 556 n. 1 (3d Cir.1977)). While the Third Circuit has on occasion followed this "collapsed" approach, *see Mellon Bank,* 960 F.2d at 1221, it has not held that this approach is universally applicable.

The court believes that the "two step" and not the "collapsed" approach should be preferred. One, the "two step" approach is the approach followed by the Pennsylvania Supreme Court and lower Pennsylvania courts. Under *Erie* principles, a federal court sitting in diversity is bound to follow the dictates of the forum's highest court in a matter of construction of a state statute. Two, "collapsing" the inquiry has the effect of rendering surplusage those portions of the Pennsylvania long-arm statute which enumerate the specific types of conduct which authorize Pennsylvania courts to assert extra forum jurisdiction. In other words, if it was Pennsylvania policy that so long as the exercise of jurisdiction does not violate due process, Pennsylvania courts can exercise personal jurisdiction over the defendant, there would be no need for the statute to provide for the specific conduct which triggers its application. Such an approach appears contrary to Pennsylvania's own rules of statutory construction. *See* Pa. Cons.Stat. Ann. § 1921(a) (West 1995) ("Every statute shall be construed, if possible, to give effect to all its provisions.").

In any event, in this case, this division of authority is not implicated in that TWK does not argue that the exercise of personal jurisdiction under the Pennsylvania long-arm statute is inappropriate. Rather, TWK contends that it is due process that is offended by the exercise of personal jurisdiction in this case.

the law of the forum in this case. The Pennsylvania long-arm statute provides for the exercise of general jurisdiction, *see* 42 Pa. Cons.Stat. Ann. § 5301 (West 1981)[8] and specific jurisdiction, *see* 42 Pa. Cons. Stat. Ann. § 5322 (West Supp.1998),[9] over non-resident defendants. General jurisdiction over a corporate defendant is proper where the corporation carries on "a continuous and systematic part of its general business within [Pennsylvania]." *See* 42 Pa. Cons.Stat. Ann. § 5301(a)(2)(iii) (West 1981). Specific jurisdiction arises when the plaintiff's "claim is related to or arises out of the defendant's contacts with the forum." *Mellon Bank (East) PSFS, Nat. Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992) (*quoting Dollar Sav. Bank v. First Sec. Bank,* 746 F.2d 208, 211 (3d Cir.1984)). In this case, Geko–Mayo contends that under the Pennsylvania long-arm statute, the court is conferred both general and specific personal jurisdiction over TWK. In response, TWK asserts that the exercise of either specific or general jurisdiction in this case would offend due process.

8. Section 5301 states in relevant part:

(a) General rule.—The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person, or his personal representative in the case of an individual, and to enable such tribunals to render personal orders against such person or representative:

\* \* \* \* \* \*

(2) Corporations.-
(i) Incorporation under or qualification as a foreign corporation under the laws of the Commonwealth.
(ii) Consent, to the extent authorized by the consent.
(iii) The carrying on of a continuous and systematic part of its general business within the Commonwealth.

9. Section 5322 provides in pertinent part:

(a) General rule.—A tribunal of this Commonwealth may exercise personal jurisdiction over a person ... who acts directly or by an agent, as to a cause of action or other matter arising from such person:

■ Once a defendant raises a jurisdictional defense, the plaintiff bears the burden of establishing, with reasonable particularity, sufficient contacts between the defendant and the forum state to support jurisdiction. *See Provident Nat'l Bank v. California Fed. Sav. & Loan Assoc.,* 819 F.2d 434, 437 (3d Cir.1987) (*citing Gehling v. St. George's School of Medicine, Ltd.,* 773 F.2d 539, 542 (3d Cir.1985)). "To meet this burden, the plaintiff must establish either that the particular cause of action sued upon arose from the defendant's activities within the forum state ("specific jurisdiction") or that the defendant has 'continuous and systematic' contacts with the forum state ("general jurisdiction")." *Provident Nat'l Bank,* 819 F.2d at 437 (*quoting Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)) (further citations omitted). "[The Plaintiff] may not rely upon the conclusory averments of the pleadings, but must come forward with competent evidence that establishes the Court's jurisdiction. 'Once the motion is made, plaintiff

(1) Transacting any business in this Commonwealth. Without excluding other acts which may constitute transacting business in this Commonwealth, any of the following shall constitute transacting business for the purpose of this paragraph:
(i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.

(ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefits or otherwise accomplishing an object with the intention of initiating a series of such acts.

(iii) The shipping of merchandise directly or indirectly into or through the Commonwealth.

(iv) The engaging in any business or profession within this Commonwealth whether or not such business requires license or approval by any government unit of this Commonwealth.

(v) The ownership, use or possession of any real property situate within this Commonwealth.

must respond with actual proofs, not mere allegations.'" *PECO Energy Co. v. PECO, Inc.,* No. 94–1750, 1995 WL 27144, at *3 (E.D.Pa. Jan.18, 1995) (*quoting Patterson by Patterson v. FBI,* 893 F.2d 595, 604 (3d Cir.), *cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990)).

Following the filing of TWK's motion to dismiss, the court permitted the parties to take discovery, limited to the issues of subject matter jurisdiction, personal jurisdiction, and *forum non conveniens.* Thereafter, both parties filed submissions in support of their contention on jurisdiction. Therefore, TWK's motion to dismiss for lack of personal jurisdiction is ripe for adjudication.

## IV. DISCUSSION

### A. *Personal Jurisdiction.*

TWK has failed to challenge the existence of a cognizable basis for specific [10] or general jurisdiction under the Pennsylvania long-arm statute. However, TWK does contend that the exercise of either specific or general jurisdiction offends due process. Thus, the analysis is reduced to the question of whether the exercise of specific or general jurisdiction under Pennsylvania law comports with the requirements of due process under federal law.

### 1. *Specific Jurisdiction.*

■ "In order for specific jurisdiction to be properly exercised under the Due Process Clause, the plaintiff must satisfy a two part test." *IMO Industries, Inc. v.*

*Kiekert AG,* 155 F.3d 254, 259 (3d Cir. 1998). "First, the plaintiff must show that the defendant has constitutionally sufficient 'minimum contacts' with the forum state." *Id.* (*citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). "Second, for jurisdiction to be exercised the court must determine, in its discretion, 'that to do so would comport with traditional notions of fair play and substantial justice.'" *Id.* (*citing Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.,* 75 F.3d 147, 150–51 (3d Cir.1996) (*citing International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

### a. *"Minimum contacts" analysis.*

■ The determination of whether sufficient minimum contacts exist for the assertion of personal jurisdiction is based on a finding that "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Burger King,* 471 U.S. at 474, 105 S.Ct. 2174 (*quoting World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Critical to this analysis is the determination that the defendant purposefully directed its activities at residents of the forum, and purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of that state's laws. Contacts with the forum state that are "random, fortuitous," or "attenuated" are not sufficient for the assertion of personal jurisdiction. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174.

10. Under Pennsylvania law, a court may exercise specific personal jurisdiction over a corporation where the plaintiff's cause of action arises from the corporation's forum related activities. *See* 42 Pa. Cons.Stat. Ann. § 5322(a). "Only those forum state contacts related to plaintiff's cause of action are relevant to this analysis." *Surgical Laser Technologies, Inc. v. C.R. Bard, Inc.,* 921 F.Supp. 281, 284 (E.D.Pa.1996). The court notes that two sections potentially form the statutory basis for specific jurisdiction in this matter. First, this cause of action may arguably arise from TWK's transacting business in the Commonwealth. *See* 42 Pa. Cons.Stat. Ann. § 5322(a)(1). The statute defines "transacting business" as the doing of a single or series of acts within the Commonwealth "for the purpose of thereby realizing pecuniary benefits or otherwise accomplishing an object." *See* 42Pa. Cons.Stat. Ann. § 5322(a)(1)(i)-(ii). Second, this case may arguably arise from TWK's causing harm in this Commonwealth by an act or omission outside of the Commonwealth. *See* 42Pa. Cons.Stat. Ann. § 5322(a)(4).

■ Geko–Mayo argues that the Contract to Supply Steam and the obligations arising from this contract between itself and TWK, provides support for the court's exercise of specific jurisdiction over TWK. Geko–Mayo emphasizes that, pursuant to TWK's obligation in the Air Force contract, Geko–Mayo was required to use U.S. anthracite coal for the length of the contract. Furthermore, Geko–Mayo claims that anthracite coal is mined and produced only in Pennsylvania, and thus, it was required to purchased this coal from Pennsylvania.[11] In addition, when the United States Air Force later questioned TWK's compliance with the Air Force contract in January 1997, specifically whether TWK was using U.S. coal at its facility, TWK then made contacts with U.S. coal suppliers to ascertain their availability to serve as suppliers of anthracite coal. These contacts included telephone calls and correspondence sent to Pennsylvania coal companies.

The court, however, cannot conclude that TWK purposefully directed its activities at the forum and purposefully availed itself of the privilege of conducting activities within the forum. It is undisputed that the contract at issue in the third-party complaint was signed in Germany and involved two German companies. All obligations under the contract were to be performed in Germany and were to be governed by German law. Under these facts, the court concludes that the parties did not intend to invoke the benefits and protections of Pennsylvania's laws in executing the contract, but rather looked to the laws of Germany for that purpose.

Nor does the fact that pursuant to the Contract to Supply Steam, TWK required Geko–Mayo to purchase U.S. coal, compels a conclusion that TWK "purposeful availed" itself of the benefits and protections of the Pennsylvania forum. In the first place, the obligation to only use U.S. coal was a United States government requirement, not one negotiated by the parties. In fact, TWK did not know or care where in the United States the coal came from, as long as it was in compliance with the Air Force contract. Nor did TWK had the authority under the Contract to Supply Steam to direct Geko–Mayo to purchase the coal from Pennsylvania. Thus, the fact the Geko–Mayo unilaterally decided to purchase coal from Pennsylvania, even assuming that TWK had knowledge of this fact, does not support the conclusion that TWK purposefully availed itself toward the forum. Rather it appears TWK's contacts with Pennsylvania are, at best, "random, fortuitous," or "attenuated." *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174.

The facts in this case are very similar to those in *Stranahan Gear Co., Inc. v. NL Indus., Inc.,* 800 F.2d 53 (3d Cir.1986). In *Stranahan,* Blue Streak Industries, Inc. ("Blue Streak"), a Louisiana corporation, contracted with NL Industries, Inc. ("NL"), a New Jersey corporation, to purchase gearbox assemblies. *Id.* at 55. These assemblies were manufactured in Pennsylvania by Stranahan Gear Company, Inc. ("Stranahan"), a Pennsylvania corporation, and shipped directly to Blue Steak in Louisiana. *Id.* After one such shipment, Blue Streak refused to accept delivery or to pay NL for the assemblies.

11. TWK disputes that anthracite coal is only produced in Pennsylvania. In addition, TWK also claims that even if anthracite coal only comes from Pennsylvania, TWK had no knowledge of this fact. However, even assuming, that anthracite coal is only mined and produced in Pennsylvania and TWK knew this fact, TWK has presented undisputed evidence that a third party could purchase this type of coal outside of Pennsylvania. In fact, in addition to purchasing coal from Lehigh, Geko–Mayo also obtained some of the U.S. anthracite coal used in Kaiserslautern, from a coal-depot in Norway. Furthermore, TWK has presented uncontradicted evidence that there are stores of U.S. anthracite coal owned by the United States government and for sale on the open market, in locations outside of Pennsylvania. Thus, the fact that anthracite coal is only mined or produced in Pennsylvania is not determinative of where or in what forum a party could contract to purchase this type of coal.

Subsequently, Stranahan filed suit against NL, in a federal district court in Pennsylvania, demanding payment for the order it sent to Blue Streak. *Id.* NL responded by filing a third party complaint against Blue Streak alleging that Blue Streak had breached its agreements with NL.[12] Blue Streak filed a motion to dismiss based on lack of personal jurisdiction, which the district court granted. *Id.* at 58. The district court reasoned that:

> " '[t]he mere fact the Blue Streak was on notice that N.L. intended to obtain the goods necessary to perform its end of the contract from a Pennsylvania manufacturer will not support the conclusion that Blue Streak purposefully availed itself of the privilege of acting within Pennsylvania. The unilateral activity of N.L. in contracting with a Pennsylvania supplier will not satisfy the requirement of contact between the defendant (here the third party defendant) and Pennsylvania . . . . ' "

*Id.* at 59 (*citing Stranahan Gear Co., Inc. v. NL Indus., Inc.,* No. 83–3259, slip op. at 6–7 (E.D.Pa. Feb.14, 1985)).

On appeal, NL contended that: 1) Blue Streak's negotiations with Stranahan in Pennsylvania and 2) Blue Streak's order of parts that it knew would be manufactured in Pennsylvania demonstrated sufficient minimum contacts with the forum for the proper exercise of personal jurisdiction. *Id.* The Third Circuit, found that because Blue Streak had placed its order with NL, a New Jersey corporation, and not with Stranahan; and that it was NL, not Blue Streak, that decided to fill this order through Stranahan, which manufactured the goods in Pennsylvania, the dismissal on the basis of lack of jurisdiction was proper. The court adopted the reasoning of the district court and concluded that the unilateral activity of a third party cannot constitute a basis of jurisdiction over another party, even if the party has knowl-

edge of the actions of the independent third party. *Id.* (*citing Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Similarly, TWK's knowledge that Geko–Mayo was purchasing the coal from a Pennsylvania company and its subsequent limited contacts with Pennsylvania coal companies is not sufficient minimum contacts with the forum for the proper exercise of personal jurisdiction in this case. Pursuant to the Contract to Supply Steam, TWK only required Geko–Mayo to use U.S. anthracite coal. It was Geko–Mayo, not TWK, that decided to purchase this coal from Lehigh, a Pennsylvania coal company. Thus, the unilateral activity of Geko–Mayo cannot constitute a basis of jurisdiction over another party. *Id.*

Geko–Mayo cites *Burger King v. Rudzewicz* as support for its argument that the court has specific jurisdiction over TWK. This reliance is misplaced. In that case, defendant was a Michigan resident who entered into a franchise contract with Burger to operate a restaurant in Michigan. *Burger King,* 471 U.S. at 464, 105 S.Ct. 2174. Burger King, a Florida corporation with its principal offices located in Miami, Florida, brought suit against defendant in Federal District Court in Florida alleging breach of contract and trademark infringement as a result of plaintiff's continued operation of a franchise after Burger King terminated plaintiff's franchise for non-payment of fees. *Id.*

The Supreme Court found the defendant was subject to specific personal jurisdiction in Florida because the defendant had directly entered into a franchise agreement with a Florida resident that "envisioned continuing and wide-reaching contracts" with Burger King in Florida. *Id.* at 480, 105 S.Ct. 2174. In addition, the agreement provided that the franchise relationship was established in Miami, governed by Florida law, and called for

---

**12.** NL also alleged that Blue Streak had entered into separate negotiations with Stranahan to extend and delay the delivery terms of

NL's contract with Blue Streak and add an interest charge upon undelivered goods. *Id.*

the payment of all required monthly fees and the forwarding of all relevant notices be made to Burger King in Florida. *Id.* In concluding that jurisdiction was proper in Florida, the Supreme Court stated "[plaintiff] most certainly knew that he was affiliating himself with an enterprise based primarily in Florida. The contract documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced in Miami." *Id.*

Unlike the facts in *Burger King,* TWK did not enter into a contract with a Pennsylvania resident. Furthermore, neither the Contract to Supply Steam nor the Air Force contract envision TWK making payments or communication specifically directed toward Pennsylvania. In addition, the contract between TWK and Geko–Mayo provided that the laws of Germany would be controlling. Thus, unlike the contacts in *Burger King,* TWK's contacts with Pennsylvania are too "random, fortuitous," or "attenuated" to justify the exercise of specific jurisdiction.

b. *"Fair play and substantial justice" analysis.*

 Even assuming that TWK did have sufficient minimum contacts with the forum state, the exercise of personal jurisdiction in this case would offend due process. Personal jurisdiction may only be asserted when the nature and quality of that defendant's activities are such as to make it reasonable and fair to require him to conduct his defense there. *Burger King,* at 477–78, 105 S.Ct. 2174. The factors to be considered in making this fairness determination are: (1) the burden on the defendant, (2) the forum State's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and (5)

the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 477, 105 S.Ct. 2174.

 The court concludes that it would be unfair and unreasonable to require TWK to defend a case in Pennsylvania where all of the activities giving rise to the cause of action between Geko–Mayo and TWK occurred in Germany. Furthermore, neither party is a resident of Pennsylvania and all of the relevant negotiations concerning the Contract to Supply Steam took place outside of Pennsylvania. To put it succinctly, the contract was made in Germany, performed in Germany, allegedly breached in Germany, and was to be construed under German law.

Furthermore, Pennsylvania has little interest in adjudicating a dispute between two German corporations over a contract to be performed entirely in Germany. While it is true that Pennsylvania has a vested interest in protecting the interests of Pennsylvania coal companies, these interests are implicated only in the underlying dispute between Lehigh and Geko–Mayo, and not in the contract between TWK and Geko–Mayo. In any event, Lehigh will be able to obtain adequate relief, if it is entitled to it, from Geko–Mayo in the underlying action.

Lastly, TWK has demonstrated that requiring it to defend against this lawsuit in Pennsylvania will be extremely burdensome. TWK does all its business in Germany, limited to the area in and around Kaiserslautern. Most of the documents and witness concerning the formation of the Contract to Supply Steam are located in Germany, since both the plaintiff and the defendant are German corporations. Furthermore, the court is confident that Geko–Mayo will be able to obtain effective and adequate relief in the German courts. Thus, requiring TWK to defend this action in a far away forum on the basis of such attenuated contacts would be, in the court's view, fundamentally unfair. For the above mentioned reasons, the court concludes that the exercise of specific jur-

isdiction over TWK in this case would violate due process.

### 2. *General Jurisdiction.*

■ Although the tests used in general jurisdiction and specific jurisdiction case are worded differently, they are both aimed at achieving the same goal. Larry L. Teply and Ralph U. Whitten, *Civil Procedure* 303 (1994). The objective of either test is to protect the due process rights of the defendant and "assure an adequate opportunity to be heard in defense ... [and] ... that the defendant may not be subjected to an unreasonably burdensome place of suit." *Id.* While neither the United States Supreme Court nor the Third Circuit has expressly adopted a two prong test similar to the one applicable to a determination of specific jurisdiction in a general jurisdiction case, it is clear that in a general jurisdiction case, as well as in a case implicating specific jurisdiction, notions of "minimum contacts" and "fair play and substantial justice" guide the analysis. *See Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868 (1984) (citing *International Shoe* concepts of fairness in a general jurisdiction case); *Gehling,* 773 F.2d at 540–41 (same). Thus, in cases involving general jurisdiction, "if the court determines that there are sufficient minimum contacts with the forum state, the court may then determine 'whether the assertion of personal jurisdiction accords with the notions of fair play and substantial justice.'" *Driscoll v. Matt Blatt Auto Sales,* No. 95–5314, 1996 WL 156366, at *4 (E.D.Pa. Apr.3, 1996) (*citing Mesalic v. Fiberfloat Corp.,* 897 F.2d 696, 701 (3d Cir.1990) (*quoting International Shoe,* 326 U.S. at 316, 66 S.Ct. 154)).

### a. *"Minimum contacts" analysis.*

■ "In order to establish general jurisdiction, the plaintiff must show significantly more contacts with the forum state than the mere minimum contacts required

for specific jurisdiction." *Modern Mailers, Inc. v. Johnson & Quin, Inc.,* 844 F.Supp. 1048, 1051–52 (E.D.Pa.1994) (*citing Dollar Sav. Bank v. First Sec. Bank,* 746 F.2d 208, 212 (3d Cir.1984); *Reliance Steel Prods., Co. v. Watson, Ess. Marshall & Enggas,* 675 F.2d 587, 589 (3d Cir. 1982)). If the claim arises from non-forum related activity, the non-resident defendant's contacts with the forum must be "qualitatively and quantitatively greater than where the cause of action is forum-related." *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances,* 723 F.2d 357, 362 (3d Cir.1983). "Due process requires that a court can exercise general jurisdiction only over a defendant who has maintained 'continuous and substantial' contacts with the forum state." *Modern Mailers,* 844 F.Supp. at 1052 (*citing Reliance Steel,* 675 F.2d at 588 (citations omitted)).

■ Initially, Geko–Mayo points to the same contacts, its contract with TWK and the requirement that U.S. coal must be used to heat the military base in Kaiserslautern, to argue that the court has general jurisdiction over TWK. Geko–Mayo argues that as long as TWK is under the obligation to use U.S. anthracite coal as the baseload fuel to make steam in its Kaiserslautern facility, TWK will have systematic and continuous contacts with Pennsylvania.[13] Although TWK entered into a contract with Geko–Mayo whereby Geko–Mayo was to procure the coal, ultimately TWK was primarily responsible under the Air Force contract with the United States. Thus, according to Geko–Mayo, TWK will always have to purchase U.S. anthracite coal, from a Pennsylvania company, so long as it contracts with the United States Air Force.

The court has previously concluded that these contacts are too attenuated to establish specific jurisdiction, and thus these

---

**13.** This assumes, of course, that U.S. anthracite coal is produced and sold only by Pennsylvania coal companies.

contacts alone will obviously not satisfy the requirements for general jurisdiction.[14]

■ Geko–Mayo, further argues that, in addition to these contacts, TWK's other contacts with the forum establish that TWK maintains "continuous and substantial" contacts with Pennsylvania. Geko–Mayo emphasizes TWK's long courtship of the United States coal industry, as well as TWK's post-breach direct contact with Pennsylvania coal companies.

First, Geko–Mayo points to TWK's alleged long courtship of the United States anthracite coal industry, particularly Pennsylvania coal producers, in order to become the sole source provider of heat for the United States Air Force base located in Kaiserslautern. From 1987 through 1994, TWK, through its executive director Wolfgang Herzog ("Herzog"), brought together various coal producers interested in participating with TWK in its plan to be the sole provider of heat. On several occasions, TWK hosted meetings and conferences in Kaiserslautern. One of the participants at these meetings in Kaiserslautern was an organization called the Anthracite Industry Association, Inc. ("AIA").[15] Furthermore, in order to secure the contract with the Air Force, Geko–Mayo claims that TWK hosted several receptions where Pennsylvania Congressmen met with AIA and TWK in order to confirm and consolidate the relationship between the respective parties.[16]

**14.** Furthermore, courts have found a lack of general jurisdiction where defendants had similar limited contacts with the forum state due to the actions of a third party or the requirements of a contract. For example, in *Allied Leather Corp. v. Altama Delta Corp.*, 785 F.Supp. 494, 500 (M.D.Pa.1992), the court found that the defendant did not carry on a continuous and systematic part of its business with Pennsylvania and therefore was not subject to the general jurisdiction of the court. In so holding, the court noted that although Altama had direct contacts with the forum, by picking up goods, making telephone calls and sending correspondence, its contacts with the Commonwealth were "the unintended consequence of its relationship with entities which are based in other jurisdictions." *Id.* at 499 (citing *In Freedom Forge Corp. v. Jersey Forging Works, Inc.*, 549 F.Supp. 99, 101 (M.D.Pa. 1982) (stating "[t]he continuous and substantial activities test refers to activities by the defendant, not be someone else who might bring suit against the defendant in Pennsylvania.")). The court stated that "[t]he only 'continuous and substantial' contacts listed here by plaintiff stem from business activity with the United States Department of Defense, based at the Pentagon, and with Allied, based in New York. Defendant dealt with [the Defense Department's agent] in Philadelphia because the United States government decided that was where the subagency should be located; similarly, defendant dealt with people at the Allied plant in Pennsylvania because that was where Allied had the ability to produce the specified leather." *Id.* at 499.

Similarly, the limited contacts that TWK did have with Pennsylvania were the unintended consequences of its relationship with entities based in other jurisdictions. Under the terms of the Air Force contract, TWK was free to purchase coal from bidders located anywhere, as long as the bidder used U.S. anthracite coal. Furthermore, nowhere in TWK's contract with the Air Force or in its contract with Geko–Mayo is there a requirement that the coal come from Pennsylvania. *See Tamaqua Cable Products Corp. v. Dunlap Electronics, Inc.*, 531 F.Supp. 388, 389–90 (E.D.Pa.1982) (concluding that where contract between parties did not call for performance in any location, a single contact with forum by plaintiff in performing contract not sufficient to establish personal jurisdiction). As previously noted, TWK was not concerned where within the United States the coal came from, or whether anyone who had mined, shipped or otherwise handled the coal was a resident of Pennsylvania.

**15.** Pennsylvania anthracite coal producers formed AIA in the early 1980's. The president of the association was Michael Clark ("Clark"), who acted as a lobbyist for the group. Clark and Robert Fiore ("Fiore"), as representatives of AIA, claim to have meet with Herzog numerous time between 1987 and 1994. In addition, Geko–Mayo claims that when Clark was in Kaiserslautern working with TWK, they provided him with office facilities in TWK headquarters, secretarial services and the use of other facilities.

**16.** Throughout this process, Geko–Mayo alleges that AIA kept TWK informed of the efforts of the Pennsylvania Congressmen to persuade the United States military to use U.S. anthracite coal as the base source for the heating of the military installation in Kaiserslautern.

In the early 1990's, TWK also entered into an agreement with AIA confirming its commitment to use U.S. anthracite coal for their heating facility in Kaiserslautern. To further confirm their commitment and win the contract, several representatives of TWK traveled to Washington D.C. to meet with Congressional representatives from Pennsylvania.[17]

Second, Geko–Mayo highlights the fact, that after the alleged breach of the Contract to Supply Steam, TWK initiated price inquiries from Pennsylvania companies and ultimately contracted with a company which acquires its coal from a Pennsylvania corporation.

The court agrees that TWK's lobbying of Pennsylvania based coal companies and Pennsylvania politicians constitutes a form of business solicitation. Business solicitations targeted to the forum state is, indeed, a factor to be considered in determining whether a non-resident maintains a "continuous and substantial part" of its business in the forum state. *See Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539, 541–43 (3d Cir.1985).[18] But solicitation of business aimed at the forum state is not the dispositive factor in determining general jurisdiction. *See Provident Nat'l Bank*, 819 F.2d at 437. Rather, courts in cases where solicitation has been found to be present, have placed the solicitation of business in context by considering other factors such as: the percentage of its revenue the non-resident derived for sales within the forum, *Gehling*, 773 F.2d at 541–43; the number of sales made by the

non-resident in the forum, *Modern Mailers*, 844 F.Supp. at 1051–52; and whether the solicitation is regularly conducted and specifically targeted at the forum market, *Strick Corp. v. A.J.F. Warehouse Distributors Inc.*, 532 F.Supp. 951, 956 (E.D.Pa. 1982). To put it another way, what is crucial in determining the presence of general jurisdiction is whether a non-resident's contacts with Pennsylvania, including the solicitation, are "central to the conduct of [the non-resident's] business." *Provident Nat'l Bank*, 819 F.2d at 437.

*Provident Nat'l Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir.1987) is illustrative of this approach. There, the Third Circuit held that Pennsylvania had general jurisdiction over a California bank whose only contacts with Pennsylvania consisted of having a minuscule percentage of its depositors in Pennsylvania, receiving a minimal amount of its deposits from Pennsylvanians, and having few outstanding loans to Pennsylvania residents. *Id.* 436. However, the bank maintained a continuous "controlled disbursement" account with a Pennsylvania bank for the daily disbursement of checks in Pennsylvania. *Id.* The Third Circuit stated that neither the percentage of business in the forum state, nor the absolute amount of sales and customers in the forum state was dispositive proof of "continuous and systematic" activity. *Id.* at 438. Rather the contact that the court found to be most critical to its finding of general jurisdiction was the fact that defendant conducted business daily with a Pennsylva-

17. At these meetings, it was made clear to TWK that it would not be given a contract to heat the U.S. military installations unless it used U.S. anthracite coal.

18. The court has not found any cases where a defendant's solicitation of business alone, was sufficient to establish general jurisdiction. *See Driscoll v. Matt Blatt Auto Sales*, No. 95–5314, 1996 WL 156366, at *4 (E.D.Pa. Apr.3, 1996) (stating that "seeking business in a non-forum state, of course, does not by itself constitute 'continuous and substantial business activity.'") (*citing Reliance Steel*, 675 F.2d at 589). In addition, while representatives from

TWK have lobbied the United States in Washington D.C. and hosted receptions for United States representatives in Germany, there is no evidence that a TWK representative ever traveled to Pennsylvania. Thus, it is uncontradicted that all lobbying or solicitation of political representatives, as well as representatives of the coal industry, took place outside of Pennsylvania. Furthermore, while TWK did work closely with AIA over the years to secure the contract, TWK presented evidence that it was unaware that AIA solely represented the interests of Pennsylvania coal companies.

nia bank. It was this contact that the court found to be a "continuous and central part" of the defendant's business. *Id.* The court reasoned that conducting central business functions within the forum state creates an expectation of being haled into court in that state. *Id.*

Based on an analysis of these factors, this court cannot conclude that TWK conducts a "continuous and central" part of its business in Pennsylvania. It is undisputed that TWK's principal business "is to sell the steam generated by the private heating facility in the City of Kaiserslautern ... to, among others, the United States government to heat its local [European] military facility." Geko–Mayo's Third Party Compl. ¶ 11. All of this business is conducted in and around the Kaiserslautern area. Thus, TWK conducts none of its day-to day business anywhere in the United States, including Pennsylvania. While TWK's operation of its business requires the use of U.S. anthracite coal to produce the steam, the purchasing of coal is not the "bread and butter" of TWK's daily business. *See Provident*, 819 F.2d at 437. In fact, TWK specifically contracted the obligation to purchase U.S. anthracite coal to Geko–Mayo, making Geko–Mayo responsible for this aspect of TWK's business.

Placing the solicitation in this context, the court concludes that the solicitation activities are insufficient to support the claim that TWK maintains a continuous and substantial part of its business in Pennsylvania. TWK maintains no offices or employees in Pennsylvania, owns no real estate in Pennsylvania, does not ship goods into Pennsylvania or make any direct sales in Pennsylvania, and does not directly export any goods from Pennsylvania. In fact, all of TWK's revenues are generated from its business activities within Germany. While, TWK did make some efforts to gain the support of Pennsylvania businesses and politicians to obtain the contract with the United States government to provide heat to a military facility in Germany, and did make direct bid inquiries to various companies in Pennsylvania following the alleged breach, such contacts are hardly substantial and continuous. *See, e.g., Gehling,* 773 F.2d at 542–43 (concluding that a medical school lacks continuous and substantial business relationship with Pennsylvania despite directing advertisements toward Pennsylvania, having 6% of its students from Pennsylvania, and conducting a joint international program with a Pennsylvania college); *Modern Mailers,* 844 F.Supp. at 1054 (concluding defendant's Pennsylvania contacts were not continuous and systematic despite defendant having over $200,000 in direct sales to Pennsylvania and some of defendant's salespersons soliciting business in Pennsylvania); *Strick Corp. v. A.J.F. Warehouse Distributors Inc.,* 532 F.Supp. 951, 956 (E.D.Pa.1982) (concluding that the defendant did not maintain a continuous and systematic part of its business in Pennsylvania despite entering into leases with Pennsylvania companies, maintaining offices in Pennsylvania, and placing ads that circulated in Pennsylvania).

b. *"Fair play and substantial justice" analysis.*

For the same reasons discussed in connection with the exercise of specific jurisdiction over TWK, even assuming that TWK's contacts with Pennsylvania are "continuous and substantial", the exercise of general jurisdiction in this case would be unreasonable and unfair. *See supra* pp. 568–570.

## V. CONCLUSION

The court finds that Geko-Mayo has failed to show the presence of specific or general jurisdiction. In any event, the exercise of either specific or general jurisdiction over TWK in this case would offend due process. An appropriate order follows.

## ORDER

**AND NOW**, this 7th day of **July, 1999**, upon consideration of Geko–Mayo's motion and memorandum in support of its submission regarding jurisdiction (doc. no. 20), and TWK's response thereto (doc. no. 23), is hereby **ORDERED** that TWK's motion to dismiss is **GRANTED** and Geko–Mayo's Third–Party Complaint is **DISMISSED WITHOUT PREJUDICE** pursuant to Fed.R.Civ.P. 12(b)(2).

**AND IT IS SO ORDERED.**